UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x
                                    :

DARRYL GODFREY,                 :
                                     :

                Plaintiff,     :     **<u>MEMORANDUM & ORDER</u>**
                                     :

        -against-           :     02-cv-2101 (DLI)(RER)
                                     :

NEW YORK CITY TRANSIT     :
AUTHORITY,                 :
                                     :

              Defendant. :
                                     :
-------------------------------------------------- x

DORA L. IRIZARRY, United States District Judge:

      Plaintiff Darryl Godfrey brings this action against defendant, the New York City Transit Authority ("TA"), under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the New York State Executive Law § 296 ("New York State Human Rights Law"), alleging that defendant discriminated against him on the basis of his hearing disability when it placed his application to be a revenue collecting agent on medical hold. Defendant moves for summary judgment, asking the court to dismiss the action in its entirety. For the reasons set forth below, the motion is granted. Although there is a triable issue as to whether plaintiff is disabled under the ADA, the court finds that he did not suffer an adverse employment action and that defendant's efforts to evaluate plaintiff's hearing ability were job related and consistent with a necessary business interest of the TA. Thus, plaintiff does not have a claim under the ADA. The Title VII claim is

dismissed because Title VII does not recognize discrimination claims based on disability.  Without the federal claims, the court declines to exercise supplemental jurisdiction over plaintiff's claim under the New York State Human Rights Law.

I.    Procedural History

Defendant first served its summary judgment papers on plaintiff in mid-August 2005.  After plaintiff failed to submit a timely opposition or request an extension, the court deemed the motion unopposed on October 13, 2005.  On November 10, 2005, and again on June 6 and August 10, 2006, plaintiff moved for reconsideration of the court's decision to deem the motion unopposed.[1]  The court denied all three requests, noting that it had repeatedly warned plaintiff about the potential consequences of failing to comply with the court's orders, including sanctions and dismissal.

After reviewing the unopposed summary judgment papers in a light favorable to the non-moving party and finding that defendant had met its burden of demonstrating that no genuine issue of material fact remained for trial, the court dismissed the action in its entirety.  *See Godfrey v. New York Transit Auth.*, No. 02-CV-2101, 2006 WL 2505233 (E.D.N.Y. Aug. 28, 2006).  The court found that: (1) plaintiff was not disabled under the ADA; (2) he did not suffer an adverse employment action; and (3) defendant's efforts to evaluate plaintiff's hearing ability

---

[1] Plaintiff was originally represented by counsel who repeatedly failed to comply with the court's orders, including the directive to file opposition papers pursuant to deadlines set by the court.  By letter dated June 6, 2006, plaintiff advised the court that the attorney no longer represented him.  On July 21, 2006, the court was notified that plaintiff had retained new counsel.

were job related and consistent with a business necessity. *See id.* at *3-6. The court dismissed the Title VII claim as that statute does not recognize discrimination claims based on disability. *See id.* at *8. Having dismissed all of the federal claims, the court declined to exercise supplemental jurisdiction over the state-law claim. *See id.*

Plaintiff appealed the court's denials of the reconsideration motions and its decision to grant summary judgment. The Second Circuit vacated and remanded the case for further explanation as to why the court denied plaintiff's second and third requests for reconsideration. *See Godfrey v. New York Transit Auth.*, 258 F. App'x. 353, 355 (2d Cir. 2007). The Second Circuit did not, however, address the court's decision on the motion for summary judgment. *See id.* The court then permitted plaintiff to file opposition papers, which he did. Plaintiff did not challenge the court's decision to dismiss the Title VII claim, but did challenge the court's decision to dismiss the claims under the ADA and New York State Human Rights Law.

II.     Background

In 2000, plaintiff applied for a provisional appointment as a revenue collecting agent with the TA. (56.1 Statements at ¶ 1.) Revenue collecting agents protect, collect, and transport revenue and revenue-related items (such as MetroCards) from various points on the subway. (56.1 Statements at ¶ 2; *see also* Schoolman Decl. Ex. 2; D'Amato Dep. at 12:11-22; Levy Decl. Ex. O.) They also drive armored cars transporting the revenue and provide security for TA workers as

they repair MetroCard vending machines. (56.1 Statements at ¶ 2; *see also* Schoolman Decl. Ex. 2; D'Amato Dep. at 12:11-22; Levy Decl. Ex. O.) Revenue collecting agents must carry a gun. (56.1 Statements at ¶ 2; *see also* Schoolman Decl. Ex. 2; D'Amato Dep. at 12:11-22; Levy Decl. Ex. O.)

When plaintiff applied for the position, he wore a hearing aid to improve the hearing in his right ear. (Pl.'s 56.1 Statement at ¶ 3.) He has no hearing in his left ear. (*Id.*) Plaintiff had previously worked as a security guard for the Port Authority of New York and New Jersey, and as an armed courier, an air courier, and a driver. (56.1 Statements at ¶ 4.) Plaintiff claims that wearing a hearing aid has never interfered with his ability to do any of these jobs and that he can perform all of the essential functions of a revenue collecting agent while wearing his hearing aid. (*Id.*)

Several months after plaintiff first applied for the position, defendant requested an in-person interview. (56.1 Statements at ¶ 8.) Henry D'Amato, who was the Senior Director for the Revenue Collecting Department, conducted the interview and found plaintiff qualified to proceed to the next phases of the application process. (56.1 Statements at ¶¶ 9-10.) At the time of the interview, D'Amato knew that plaintiff wore a hearing aid. (56.1 Statements at ¶ 11.)

After D'Amato interviewed plaintiff, Valerie Blakes, a TA Supervisor, helped plaintiff apply for a New York City pistol license. (56.1 Statements at ¶ 12.) Plaintiff submitted his pistol application and then contacted Blakes two months later when he had not received an update on his application. (56.1 Statements at ¶ 13.) Blakes explained that there was a problem with his application. (*Id.*) Plaintiff,

in the attachments to his application, had alluded to being terminated from a prior job because of an accusation that he had engaged in employee theft. (*Id.*) According to plaintiff, he was fired because he inadvertently mixed up the orders of two customers by providing one customer with the stereo that the other customer had purchased. (Pl.'s 56.1 Statement at ¶ 58.) Both D'Amato and Blakes met with plaintiff for a second interview and asked him to submit a letter explaining the circumstances of this termination, which he did. (56.1 Statements at ¶¶ 14-15.)

In early 2001, plaintiff received his New York City pistol license, which he submitted to defendant. (56.1 Statements at ¶ 15.) Approximately one month later, plaintiff received a letter from defendant instructing him to report to the TA Medical Department on February 26, 2001 to undergo a drug test. (56.1 Statements at ¶ 16.) Plaintiff complied and passed the drug test. (56.1 Statements at ¶ 17.) Defendant then asked him to return on March 1, 2001 to complete the remainder of his medical examination. (*Id.*)

On March 1, 2001, plaintiff underwent a variety of physical exams, including an unaided hearing exam. (56.1 Statements at ¶ 18, 21.) Defendant was not, however, able to evaluate plaintiff's hearing ability while using a hearing aid because it did not have the necessary equipment. (56.1 Statements at ¶ 19, 21.) Therefore, it asked plaintiff to take an aided hearing exam with his own physician and provide the results. (56.1 Statements at ¶ 19, 21.) Defendant then placed plaintiff on medical hold until it could evaluate the results of his aided hearing test and determine whether he met the medical standards for a revenue collecting agent.

(56.1 Statements at ¶ 21.)  Plaintiff claims that, during the March 1, 2001 exam, a physician for the TA informed him that there was no hearing requirement for revenue collecting agents.  (Godfrey Aff. at ¶ 18.)

Plaintiff took an aided hearing test, and on March 5, 2001, provided the results to defendant.  (Godfrey Aff. at ¶ 20; Godfrey Dep. at 98:23-99:3.)  The results showed that his aided hearing was at 76 decibels.  (*Id.*)  Plaintiff had taken this test with his older hearing aid (Godfrey Dep. at 98:23-99:3) even though he had a newer "bidirectional" hearing aid, which

> allow[ed] [him] to work in noisy places and understand a person, cut off the volume of the noise around [him] and direct the microphone straight to the person that [he is] talking to, or the person behind [him], so it allows [him] to do a lot more work, the hearing aid allows [him] to do more in noisier places than the conventional hearing aid that just have [sic] a microphone and just picks up everything. . . . So in general it was a better hearing aid [than the old one.]

(Godfrey Dep. at 97:4-20.)

According to plaintiff, the TA physician informed him that the results were unacceptable because the TA was "looking for 80 [decibels]."  (Godfrey Dep. at 100:11-15.)  The physician did not, however, disqualify plaintiff, but rather asked him to get his hearing aid readjusted to help improve his hearing to 80 decibels.  (*Id.*)  That same day, plaintiff retook the hearing test with his newer hearing aid and achieved a rating of 92 decibels.  (Levy Decl. Ex. B at ¶ 7; Godfrey Dep. at 102:5-11, 106:4-10; Godfrey Aff. at ¶ 20; 56.1 Statements at ¶ 30.)  He immediately returned to the TA physician with the results.  (Levy Decl. Ex. B at ¶ 7; Godfrey Dep. at 102:5-11, 106:4-10; Godfrey Aff. at ¶ 20; 56.1 Statements at ¶ 30.)  Plaintiff

alleges that, during this meeting, while in the presence of other applicants, the physician told him that he "could not carry a gun and wear a hearing aid at the same time." (Godfrey Aff. at ¶ 21.) The physician then told plaintiff that the TA would contact him once they decided what to do with his application. (Godfrey Aff. at ¶ 23.)

According to defendant, it kept plaintiff on medical hold even after receiving the updated hearing test results so that it could determine if it needed to administer a practical field test to determine whether plaintiff's hearing impairment may create a danger to himself or the public, or would adversely affect his ability to do the job. (Clarke-Belgrave Dep. at 27:8-29:9; Clarke-Belgrave Aff. at ¶ 9; 56.1 Statements at ¶ 32.) During her deposition, Dr. Cassandra Clarke-Belgrave, who was the Medical Director of the TA, explained that, even when an individual with a hearing aid meets or exceeds the minimum hearing requirements under a controlled testing condition, the TA may still require the individual to undergo a practical field test. (Clarke-Belgrave Dep. at 27:15-28:4.) The TA uses the test to determine how well that person hears in environments with background noises that the applicant would likely encounter. (*Id.*) Dr. Clarke-Belgrave also explained that "in the case of the collecting agent, even today it probably could take time because we don't have a practical field test set up for collecting agents." (Clarke-Belgrave Dep. at 29:6-9.)

At the time plaintiff applied, defendant was developing a specific job profile for the position of revenue collecting agent, which would list the work conditions

and physical requirements for the job. (56.1 Statements at ¶ 22; Clarke-Belgrave Dep. at 14:7-12.) Although defendant had expected to implement the profile and use it as a basis for a practical field test soon after plaintiff applied, defendant did not fully implement the profile until early 2002. (56.1 Statements at ¶ 23; Clarke-Belgrave Aff. at ¶ 9.) Until then, defendant used something called a "broad-banded" job profile to assess candidates applying to become revenue collecting agents. A broad-banded job profile is a job profile for a position that the Occupational Industrial Orthopedic Center ("OIOC"), an outside vendor hired by defendant, deems to be sufficiently similar with the physical requirements and work conditions of another position. (Clarke-Belgrave Dep. at 14:25-15:5.)[2] In this case, the OIOC deemed the broad-banded job profile of a station agent, also referred to as a railroad clerk (*see* Clarke-Belgrave Dep. at 19:11-13; 43:21-44:6), to be fully compatible with the position of a revenue collecting agent. (Clarke-Belgrave Dep. at 15:9-18.)

By May 2001, defendant concluded that it most likely would not have an approved job profile for a revenue collecting agent anytime soon, and under the broad-banded job profile for railroad clerk/station agent, a practical field test was not required. (56.1 Statements at ¶ 34; Clarke-Belgrave Aff. at ¶ 10.) The parties differ on what happened to plaintiff's application in May and June 2001.

According to defendant, it deemed plaintiff medically qualified and lifted the medical hold on May 24, 2001. (Def.'s 56.1 Statement at ¶ 35.) Defendant then

---

[2] The OIOC is a consulting group at the New York University Medical Center that has provided, *inter alia*, workplace evaluation services. (Clarke-Belgrave Dep. at 14:25-15:5; *see also* www.med.nyu.edu/oioc/consultation/, last visited on May 27, 2009.)

asked him to take another drug test because the test was only valid for 30 days and his last drug test was on February 26, 2001. (Def.'s 56.1 Statement at ¶ 36.) Defendant left plaintiff telephone messages in late May and early June asking him to return to the TA Medical Center for a drug test. (Def.'s 56.1 Statement at ¶ 37; Levy Decl. Ex. F.) Defendant also sent plaintiff a letter on June 12, 2001, requesting that he report for a medical examination on Tuesday, June 25, 2001. (Def.'s 56.1 Statement at ¶ 40.) Plaintiff did not respond to either the messages or the letter.

Plaintiff denies that defendant removed the medical hold. (Pl.'s 56.1 Statement at ¶ 35.) As such, he denies that it was necessary for him to take another drug test. (Pl.'s 56.1 Statement at ¶ 36.) Plaintiff acknowledges, however, that he did receive the letter asking him to report for a medical examination, and that, sometime between April 26, 2001 and June 22, 2001, he also received phone messages from defendant asking him to provide a urine sample for a drug test. (Godfrey Dep. at 115:6-117:16 (explaining that sometime after "the 50-h hearing," which was conducted on or about April 26, 2001 (Compl. at ¶¶ 24-25) and before receiving defendant's June 12, 2001 letter on June 22, 2001 (56.1 Statements at ¶ 40) he received "maybe two or three . . . phone messages" asking him to "[c]ome down and take a urine test").) Plaintiff admits that he did not respond to either the calls or the letter. (Godfrey Dep. at 117:20-118:4; 56.1 Statements at ¶¶ 40-41.)

Plaintiff explained that he did not return the messages because they did not provide a contact number nor did they ask him to call. (Godfrey Dep. at 116:15-

117:5.)  Furthermore, plaintiff claimed that the number he had for the TA at the time "was only answering machine messages[,] [a]nd [he] refused to leave a message on the answering machine."  (Godfrey Dep. at 116:23-24.)  Plaintiff explained that he did not respond to the letter because: (1) it asked him to report for a medical examination on Tuesday, June 25, 2001, and June 25, 2001 was a Monday, not a Tuesday; (2) the letter did not notify him that he was taken off of medical hold; (3) he did not understand why defendant wanted another medical examination; and (4) the letter did not provide a telephone number for him to call to resolve his concerns.  (Godfrey Aff. at ¶ 27; Godfrey Dep. at 119:13-120:2.)

On September 8 and 9, 2001, defendant again contacted plaintiff and told him "you're in" (Godfrey Aff. at ¶ 31) and asked him to report for a drug test (56.1 Statements at ¶ 42).  Plaintiff did not report for the drug test, but instead, asked defendant to contact his attorney.  (Godfrey Aff. at ¶¶ 31-32.)[3]  Defendant never informed plaintiff that he was medically unfit for a position with the TA.  (56.1 Statements at ¶ 44.)

III.  Discussion

a.  Legal Standards

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[3] On June 18, 2001, plaintiff filed a charge with the New York State Division of Human Rights ("SDHR") alleging that the TA discriminated against him based on his hearing disability.  (Levy Decl. Ex. B.)  On May 15, 2002, at plaintiff's request, the SDHR dismissed the case for administrative convenience.  (Levy Decl. Ex. E.)

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the non-moving party but "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). In order to defeat a summary judgment motion, the non-movant carries only "a limited burden of production," but "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (internal citations omitted). Those specific facts must be more than "conclusory statements, conjecture, or speculation." *Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

The Supreme Court has recently revised the summary judgment standard by requiring the court essentially to weigh the evidence presented by the non-moving party before allowing that evidence to be used to defeat a motion for summary judgment. Under the new standard, evidence presented by the non-moving party that is "blatantly contradicted by the record" should not be accepted by the court for purposes of defeating a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

b.  The ADA Claim

The ADA prohibits discrimination against qualified individuals with a disability. *Sutton v. United Air Lines*, 527 U.S. 471, 476 (1999).  A plaintiff who alleges employment discrimination under the ADA bears the initial burden of establishing a *prima facie* case.  *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d Cir. 1998); *Wernick v. Federal Reserve Bank of N.Y.*, 91 F.3d 379, 383 (2d Cir. 1996).  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) the employer is subject to the ADA; (2) he is an individual with a disability within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of the job; and (4) he suffered an adverse employment action because of the disability.  *See Ryan*, 135 F.3d at 869–870; *Wernick*, 91 F.3d 379 at 383; *Miller v. Taco Bell Corp.*, 204 F. Supp. 2d 456, 458 (E.D.N.Y. 2002).  Defendant argues that it is entitled to summary judgment because plaintiff is not disabled under the ADA and did not suffer an adverse employment action.

i.  There is a Triable Issue of Fact as to Whether Plaintiff is Disabled Under the ADA.

The ADA defines "disability" as either: (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities; (2) a record of such impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2); *Sutton*, 527 U.S. at 478.

1.  Substantial Limitation

When determining whether a plaintiff suffers a disability that substantially limits one or more major life activities, the court must use a three-step approach. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998) (citation omitted). The court must first determine whether the plaintiff suffers from an impairment. *Id.* Second, the court must ascertain whether the life activity identified by the plaintiff constitutes a "major life activity." *Id.* Third, the court must determine whether the plaintiff's impairment "substantially limits" the major life activity he has identified. *Id.*

Under the ADA, plaintiff's hearing condition is an "impairment," and hearing is a "major life activity." 29 C.F.R. §§ 1630.2(h)(1) and (i). The question of whether this impairment "substantially limits" a major life activity is a fact-specific inquiry. *Colwell*, 158 F.3d at 643. The term "substantially limits" means either that a person is unable to perform a major life activity that the average person in the general population can perform, or that a person is significantly restricted as to the condition, manner, or duration under which the activity may be performed when compared with the average person. 29 C.F.R. § 1630.2(j)(1). When making this determination, the court must consider the mitigating effects of corrective measures, such as hearing aids. *See Sutton*, 527 U.S. at 475 (holding that when determining whether a vision impairment is a deficit, the determination should be made with reference to eyeglasses and contact lenses); *Miller*, 204 F. Supp. 2d at 463 (holding

that the court must consider the plaintiff's condition as she functions with the use of lip reading and her hearing aid).[4]

Here, medical evidence from plaintiff's treating physician shows that, in March 2001, his aided speech discrimination was 92 percent with visual cues and that he suffered from "mild to moderate hearing loss in an aided condition." (Gabor Decl. Ex. D.) Based on this evidence, a reasonable juror might conclude that plaintiff's hearing is substantially limited as compared to the average person. *See Bosket v. Long Island Railroad*, 00-CV-7352 (RJD)(JMA), 2004 WL 1305746, at *4-5 (E.D.N.Y. June 4, 2004) (citing *Finical v. Collections Unlimited, Inc.*, 65 F. Supp. 2d 1032, 1040 (D. Az. 1999)) (finding a material dispute as to whether plaintiff was disabled under the ADA because of "mild to moderate" hearing loss); *Wilson v. Aetna Life and Casualty Co.*, 195 F. Supp. 2d 419, 429 (W.D.N.Y. 2002) (denying summary judgment even though plaintiff's conversational speech discrimination rate improved from 68 to 96 percent with his hearing aid)).

_____

[4] Congress recently enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), which substantially broadened the scope of the ADA. For example, Congress rejected "the requirements enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures" such as hearing aids. *Id.* at §§ 2(b)(2) and 4(a)(4)(E)(i). Although these amendments took effect on January 9, 2009, *id.* at § 8, they do not apply retroactively to conduct that preceded its effective date. *Moran v. Premier Educ. Group, LP*, 599 F. Supp. 2d 263, 271-72 (D. Conn. 2009) (citations omitted) (collecting cases reaching the same holding). Thus, the ADA Amendments Act does not apply to the events in this case, which took place in 2001.

## 2. Record of Impairment

The court, in its prior opinion, found that there was no evidence showing that defendant relied on plaintiff's past record of impairment to discriminate against him. *See Godfrey*, 2006 WL 2505223, at *5. Plaintiff has not challenged this finding, and the court finds no reason to alter its decision.

## 3. Regarded as Disabled

The court previously found that there was no genuine issue of material fact as to whether defendant regarded plaintiff as disabled. *See Godfrey*, 2006 WL 2505223, at *6. The court explained that defendant never medically disqualified plaintiff from the position of revenue collecting agent. *See Godfrey*, 2006 WL 2505223, at *6.[5] Instead, defendant merely placed plaintiff on medical hold for approximately 12 weeks while it reviewed the aided hearing test results and determined whether it was necessary to give him a practical field test, as it does for other TA positions that are sought by people with hearing impairments. *See Godfrey*, 2006 WL 2505223, at *6. In the end, defendant did not require plaintiff to take a practical field test and it deemed him medically qualified to be a revenue collecting agent on May 24, 2001. *See Godfrey*, 2006 WL 2505223, at *6. The court concluded that the "TA's release of the medical hold on plaintiff's application indicates that the TA did not regard him as substantially limited in his ability to work as a revenue collecting agent." *Id.*

---

[5] Plaintiff also concedes this point in his 56.1 Statement. (Pl.'s 56.1 Statement at ¶ 44.)

In his opposition papers, plaintiff disagrees with this conclusion but neglects to explain why. He merely states, in a heading, that "Godfrey was regarded as disabled," and then quotes various legal standards. (Pl.'s Mem. of Law at 9-11.) Plaintiff does not provide any evidence or analysis to justify this conclusion. (*Id.*) The court assumes that plaintiff disagrees with the court's prior finding on this issue because he believes that defendant never took him off of medical hold. (*See* Pl.'s Mem. of Law at 13-15 (providing seven issues of fact that allegedly preclude summary judgment including, "[w]hether the defendant ever took the plaintiff off of medical hold").) There is no triable issue with regard to this matter. Defendant provided documentary and testimonial evidence showing that it removed the hold on May 24, 2001, and plaintiff has not provided evidence to the contrary. The TA Pre-Employment Database Printout Entry for plaintiff shows that defendant deemed him medically qualified on May 24, 2001. (Levy Decl. at ¶ 18, Ex. G.) Dr. Clarke-Belgrave testified that defendant took plaintiff off of medical hold, and that, according to standard procedures, there was a qualifying slip in plaintiff's file showing that the medical hold had been lifted. (Clarke-Belgrave Dep. at 43:11-44:6 ("[S]o [plaintiff] was qualified based on the results of his audiogram that his medical provider submitted . . . ."); 45:14-46:3 ("When someone is taken off medical hold, the qualifying slip is given to the employment center and that's it. . . . [T]here was a qualifying slip in [plaintiff's] file.").)

The evidence plaintiff relies on does not create a genuine issue of material fact. Plaintiff claims that he should have received an appointment notice from

defendant if it had actually removed the hold. (Pl.'s Mem. at 14 (citing D'Amato Dep. at 96:8-12).) Plaintiff never received an appointment notice. Plaintiff also argues that defendant should have issued a qualifying slip to its Employment Center had it lifted the hold. (Clarke-Belgrave Dep. at 45:14-19.) According to plaintiff, defendant should have produced both documents in discovery but did not. Plaintiff argues that the failure to produce these documents creates an inference that defendant never lifted the hold. The court disagrees.

D'Amato's deposition testimony does not stand for the proposition that defendant should have issued an appointment notice to plaintiff in this instance. Even though D'Amato testified that a candidate would normally receive an appointment notice the day he cleared his medical hold (D'Amato Dep. at 96:10-12), D'Amato emphasized that by "clearing medical hold," he meant that the candidate had also cleared the required drug tests:

> Q: Once a person is taken off of medical hold are they required to go through the procedure again?
> A: Medical hold means they cleared it. Getting off means they cleared.
> Q: Would they be required to take a urine test?
> A: The assumption is that it is all okay.

(D'Amato Dep. at 95:9-19.) Plaintiff did not clear the required drug test. By May 24, 2001, plaintiff had to pass another drug test before reporting for work because he took his last drug test, which was only valid for 30 days, on February 26, 2001. (56.1 Statements at ¶ 17; Clarke-Belgrave Dep. at 54:9-22.) Accordingly, in late May and early June 2001, as evidenced by the Pre-Employment Contact Sheet maintained by the TA's Office of Human Resources, defendant left messages

notifying plaintiff that he needed to report for a second drug test. (Levy Decl. at ¶ 19, Ex. F.) Defendant also sent a letter on June 12, 2001, which plaintiff received on June 22, 2001, asking him to report for a medical examination on June 25, 2001. (56.1 Statements at ¶ 40.) Plaintiff did not respond to these messages and never took the second drug test. (Godfrey Dep. at 117:6-118:4.) Therefore, according to D'Amato, defendant never would have issued an appointment notice to plaintiff. (D'Amato Dep. at 95:9-19.) Thus, the lack of an appointment notice does not suggest that defendant did not lift the medical hold on May 24, 2001.

Defendant's requests for a second drug test in late May and early June 2001 also support its contention that it lifted the medical hold on or around May 24, 2001. Given that the drug test is only valid for 30 days, there would have been no reason to administer another drug test unless defendant had already lifted the medical hold or expected to lift the medical hold within 30 days.

In his affidavit opposing summary judgment, plaintiff claims that he "never received a telephone call in May or June 2001 from the defendant[, and as] a result, [he] was *never* advised that he needed to come in for a second drug screen/urine test." (Godfrey Aff. at ¶ 28 (emphasis added).) This denial contradicts his deposition testimony, in which he acknowledged receiving "two or three" calls from defendant, sometime between April 26 and June 22, 2001, asking him to "[c]ome down and take a urine test." (Godfrey Dep. at 115:6-117:16 (explaining that he received the messages "[a]fter the 50-h hearing" and before receiving defendant's June 12, 2001 letter); Compl. at ¶¶ 24-25 (establishing that the hearing pursuant to

New York State General Municipal Law § 50(h) was conducted on or about April 26, 2001).)

Plaintiff's contradictory affidavit testimony cannot be used to survive summary judgment. In *Brown v. Henderson*, the Second Circuit held that "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [the plaintiff's] own prior deposition testimony." 257 F.3d 246, 252 (2d Cir. 2001) (citations omitted). Therefore, the court rejects plaintiff's affidavit testimony claiming that he "was never advised that he needed to come in for a second drug screen/urine test." The court also rejects plaintiff affidavit testimony to the extent that it denies that he received phone messages from defendant, sometime between late April and late June 2001, requesting a urine sample for a second drug test.

Defendant's failure to produce the qualifying slip is inconsequential because defendant was not obligated to produce it. Plaintiff has not pointed to any document request or court order that required the production of this document. The only document request before the court was the subject of an unresolved dispute. On May 4, 2004, plaintiff served a document titled "Plaintiff's First Set of Interrogtories [*sic*]," which also included requests for document production. (Gabor Decl. Ex. B.) On July 24, 2004, defendant responded by letter, raising concerns about these "Interrogtories [*sic*]." (Schoolman Decl. Ex. 1.) Defendant explained that the interrogatories exceeded the 25-written-interrogatory limitation set forth

in Rule 33 of the Federal Rules of Civil Procedure. (*Id.*) Defendant also explained that the document appeared incomplete as it included blanks for specific information such as date, and names (*see, e.g.*, Gabor Decl. Ex. B at ¶¶ 3-5) and that the document was unsigned (Gabor Decl. Ex. B). In light of these deficiencies, defendant questioned whether plaintiff had inadvertently sent a rough draft of the interrogatories/documents requests and asked plaintiff to send a corrected version as soon as possible or to contact defendant. (Schoolman Decl. Ex. 1.) Plaintiff did neither. (Schoolman Decl. at ¶ 2.) Nor did it seek judicial intervention to resolve the dispute, assuming that the issue was not simply a matter of plaintiff's carelessness in sending a rough draft. (*Id.*)

Given the document's numerous typographical errors, blanks, lack of a signature, and other defects, defendant reasonably believed that the document was a rough draft sent in error. In light of defendant's timely and justified objections to the interrogatories/document requests and plaintiff's failure to respond, plaintiff cannot now expect the unsigned, defective, and incomplete document to have created an affirmative obligation on defendant to produce the qualifying slip. Furthermore, as explained above, defendant has already produced discovery sufficient to show that it lifted the medical hold. If plaintiff wanted all of the documents on the matter, it could have served a corrected document request. Alternatively, once plaintiff learned about the qualifying slip at Dr. Clarke-Belgrave's deposition, it could have requested the document. Given that plaintiff has not set forth any evidence establishing that defendant had an obligation to

produce the qualifying slip, the court cannot infer anything from defendant's failure to produce evidence that would merely have been cumulative of other documentary and testimonial evidence.

In sum, there is no genuine issue of disputed fact that, on May 24, 2001, after defendant concluded that plaintiff did not need to take a practical field test and was medically qualified, it lifted the medical hold. Moreover, it is undisputed that defendant never medically disqualified plaintiff from the position of revenue collecting agent. (56.1 Statements at ¶ 44.) Therefore, the court finds that there is no evidence suggesting that defendant regarded plaintiff as disabled.

### c. Plaintiff Did Not Suffer an Adverse Employment Action.

The court previously found that even if plaintiff was disabled under the ADA, his claim would still fail because he did not suffer an adverse employment action. *Godfrey*, 2006 WL 2505223, at *6. The court explained that under the law of this circuit, "minor stumbling blocks," including mere delays in granting employment benefits, do not amount to adverse employment action under the ADA. *See id.* (citations omitted). Because plaintiff was merely placed on medical hold for 12 weeks and the only obstacle preventing plaintiff from obtaining the position was his refusal to take another drug test despite the TA's repeated requests, the court held that the "medical hold was a minor stumbling block and not an adverse employment action on plaintiff's way toward obtaining a position as a TA revenue collecting agent." *Id.* at *7. As explained in the previous section, given that there is no

genuine dispute that defendant lifted the hold after approximately 12 weeks, the court finds no reason to alter its prior holding.

> ### d. The Medical Examinations Were Job Related and Consistent with a Business Necessity.

The ADA prohibits a covered entity from requiring a medical examination or making an inquiry regarding the nature or severity of an employee's disability unless that examination or inquiry is job related and consistent with a business necessity. 42 U.S.C. § 12112(d)(4)(A). To prove that an inquiry is consistent with a business necessity, an employer cannot simply show that an inquiry is beneficial to its business, but rather, must demonstrate that the alleged business necessity is vital to its business. *Conroy v. New York State Dept. of Correctional Servs.*, 333 F.3d 88, 97 (2d Cir. 2003).

Here, defendant gave plaintiff an unaided hearing exam and then asked plaintiff to obtain and provide the results from hearing tests taken with his hearing aid. Defendant placed plaintiff on the medical hold for 12 weeks while it evaluated the results from those exams and determined whether to test plaintiff's aided hearing in an actual work environment. These attempts to assess plaintiff's hearing ability were job related and consistent with a business necessity because they sought to assess plaintiff's ability to safely carry out his job. *See Gajda v. Manhattan and Bronx Surface Transit Operating Auth.*, 03-CV-1642 (JSR), 2003 WL 22939123, at *2 (S.D.N.Y. Dec. 12, 2003), *aff'd*, 396 F.3d 187 (2d Cir. 2005) ("[T]he Transit Authority has an unambiguous statutory obligation to conduct its operations in the interests of public safety."). Defendant has broad discretion to

determine the medical qualifications and standards for those who are entrusted with jobs that implicate public safety. *See Shannon v. New York City Transit Auth.*, 332 F.3d 95, 103 (2d Cir. 2003).

The responsibilities of a revenue collecting agent unquestionably implicate public safety. Revenue collecting agents carry guns and protect TA revenue and personnel as they deliver the revenue from various points on the public subway system (including elevated and surface lines) to the central revenue bureau, and from the bureau to banks and depositories. (Schoolman Decl. Ex. 2; D'Amato Dep. at 12:11-18.) Such deliveries occur both during the day and evening. (Schoolman Decl. at Ex. 2.) The agents also protect TA technicians as they repair MetroCard vending machines, which are also located in public areas. (D'Amato Dep. at 13:4-8.) The public transit system in New York City is often extremely crowded with belligerent passengers shoving each other while on the platforms, in the cars, and getting through turnstiles. The system can also be extremely noisy due to traffic, construction, performers, passengers, and the high-pitched screeching of in-coming trains and buses, to name a few.[6] For these reasons, it is often very difficult to hear, even without any hearing impairment, while traveling on the New York transit system.

There is no genuine dispute that an agent may expect to find himself, at some point, in such loud and crowded conditions. Under these circumstances, someone carrying a gun could pose a significant threat to the TA personnel s/he is protecting

---

[6] The court used the New York mass transit system in 2001 and takes judicial notice of the above-described conditions.

as well as the general public if, while in a crowded and noisy station, s/he cannot adequately hear vital information about an immediate danger. Therefore, defendant's efforts to adequately assess the hearing ability of a potential agent are consistent with its obligation to ensure the safety of its staff and the public.

Plaintiff contends that defendant's inquiries about his hearing capacity were not motivated by these legitimate safety concerns, but rather, by bias against people with hearing disabilities. Plaintiff makes two arguments to support this contention. First, he argues that he was the only person ever placed on medical hold because of a hearing impairment and his hold was the longest in the TA's history.[7] According to plaintiff, these facts create an inference of bias. The court disagrees. These facts, even if true, could be the result of myriad possibilities, and the court would need more information before drawing any inference from them. For example, there is no evidence showing how frequently defendant placed those applying for the position of revenue collecting agent, or positions with similar physical requirements, on medical hold. Without a large enough sample, the claim that one hold is the longest has no significance. Plaintiff also has not pointed to any evidence about other applicants with hearing impairments who applied for the position of revenue collecting agent or a similar position. Without more information, any inference

---

[7] The only evidence plaintiff offers in support of this allegation is deposition testimony from D'Amato and Dr. Clarke-Belgrave. D'Amato testified that he was unaware of any medical holds that lasted longer than plaintiff's (D'Amato Dep. at 82:14-16) and that he was unaware of anyone, other than plaintiff, being placed on medical hold due to hearing disability (D'Amato Dep. at 82:17-83:2). Dr. Clarke-Belgrave testified that he could not recall whether, prior to plaintiff, defendant had placed anyone else on medical hold due to concerns about the applicant's hearing. (Clarke-Belgrave Dep. at 58:24-59:4.)

drawn from these two facts would be speculative and cannot be used to survive summary judgment. *Molinari v. Bloomberg*, 596 F. Supp. 2d 546, 557 (E.D.N.Y. 2009) (citing *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990)).

Second, plaintiff alleges that, when he returned to the TA medical center on March 5, 2001, a physician there told him that he could not carry a gun and wear a hearing aid at the same time. (Godfrey Aff. at ¶ 21.) Plaintiff argues that this "humiliating" statement shows that defendant's decision to place him on medical hold was motivated, at least in part, by hostility towards those with hearing impediments. The only evidence plaintiff offers in support of this allegation is his April 10, 2008 Affidavit submitted in opposition to summary judgment. (Godfrey Aff. at ¶ 21; Pl.'s 56.1 Statement at ¶ 68; Pl.'s Mem. at 14-15.) This evidence cannot be used to survive summary judgment because it directly contradicts his numerous prior sworn statements. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

On two occasions, both of which were under oath and closer in time to the incident, plaintiff gave different testimony about this incident. He testified that when he returned to the TA physician on May 5, 2001, the physician told him that the TA wanted to determine *if* plaintiff could carry a weapon while wearing a hearing aid. In plaintiff's May 15, 2001 Sworn Complaint filed with the New York State Division of Human Rights just two months after the alleged incident, he states that, "[t]he Supervisor informed the doctor to put me back on medical hold until he could check out *if* I could carry a weapon while wearing a hearing aid."

(Levy Decl. Ex. B at ¶¶ 6-8 (emphasis added).)  In his September 6, 2004 deposition testimony, plaintiff repeatedly gave the same account of what the physician told him:

- "I'm gonna have to keep you on medical hold because we have to find out *if* you can carry a hearing aid and have a weapon and— have a hearing aid and carry a weapon at the same time." (Godfrey's Dep. at 102:12-17 (emphasis added).)
- "[W]e don't know *if* you can have a hearing aid at the same time." (Godfrey's Dep. at 108:3-4 (emphasis added).)
- "They said they didn't know that *if* you can carry a — have a hearing aid and carry a weapon at the same time."  (Godfrey's Dep. at 110:6-8 (emphasis added).)

When plaintiff claimed that the physician had made a "derogatory comment" about his inability to "wear a hearing aid and carry a weapon," defense counsel specifically asked: "Just to be clear, did they say you couldn't, or they had to look into this further?"  (Godfrey's Dep. at 129:8-130:3.)  Plaintiff answered: "They had to check to see *if* I can wear a hearing aid and carry a weapon for New York City Transit." (Godfrey's Dep. at 130:4-130:6 (emphasis added).)   Once again, plaintiff has submitted sworn affidavit testimony that is blatantly at odds with his prior sworn statements.   As previously explained, plaintiff cannot resort to such tactics to survive summary judgment.

Having established that the hearing tests were job related and consistent with a business necessity, the court next considers whether defendant used reasonably effective methods that were no more intrusive than necessary.   *See Conroy v. New York State Dept. of Correctional Servs.*, 333 F.3d 88, 98 (2d Cir. 2003).   The court concludes that defendant did.   On May 1, 2001, defendant administered an unaided hearing exam to plaintiff, as it had done for all of the

applicants. However, defendant was not able to fully evaluate plaintiff's hearing because it lacked the equipment to conduct a hearing test for those wearing hearing aids. Therefore, it asked plaintiff to take the test with his own physician, which he did while wearing an admittedly inferior hearing aid. This test rated his aided hearing at 76 decibels. According to plaintiff, when he presented this result to the TA physician on March 5, 2001, the physician asked him to adjust his hearing aid and retake the exam to see if he can improve his results. (Godfrey Dep. at 101:22-24.)

Plaintiff takes issue with this second request, arguing that there "exists an issue of fact as to whether the request for Godfrey to submit to an additional audiogram was made based upon legitimate public interests or, instead, was an unreasonable intrusion into Godfrey's privacy." (Pl. Mot. at 13-14.) Plaintiff has not identified any evidence to support this conclusory assertion, and nothing in the record suggests that the request for the additional audiogram was an illegitimate intrusion into his privacy. (*Id.*) To the contrary, the physician offered a legitimate explanation as to why he requested another audiogram: plaintiff's first aided audiogram rated his aided hearing at 76 decibels, and the TA was looking for hearing at 80 decibels. (Godfrey Dep. at 100:5-15.) Rather than disqualifying plaintiff, he advised him to "go back and try to get a better result, adjust the hearing aid." (Godfrey Dep. at 101:22-24.)

Following this advice, plaintiff managed to improve the results of his aided audiogram to 92 decibels. (Levy Decl. Ex. B at ¶ 7; Godfrey Dep. at 106:4-10;

Godfrey Aff. at ¶ 20.) After submitting this result, defendant did not ask for any more information about plaintiff's hearing, and 12 weeks later, it deemed him medically qualified and lifted the medical hold. The court fails to see how any reasonable juror could view the TA physician's instructions, which helped plaintiff improve his aided audiogram results, as an unreasonable intrusion into his privacy. In sum, defendant's medical decisions regarding plaintiff's application were job related, consistent with a business necessity, and not unnecessarily intrusive.

          e. State-Law Claim

In light of the dismissals of plaintiff's claims under federal law, the court declines to exercise supplemental jurisdiction over his state-law disability claim, which is "best left to the courts of the State of New York." *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001). Accordingly, the court dismisses plaintiff's state-law claim without prejudice.

IV.    Conclusion

For the reasons set forth above, defendant's motion for summary judgment on plaintiff's ADA and Title VII claims is granted. The remaining state-law claim is dismissed without prejudice. This action is dismissed in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
       September 23, 2009

                                /s/
                              DORA L. IRIZARRY
                      United States District Judge